UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
INFOSINT, S.A.,

               Plaintiff,

               -against-                        06 Civ. 2869 (LAK)

H. LUNDBECK A/S, et al.,

               Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

       Appearances:

                       James Wright Galbraith
                       KENYON & KENYON
                       *Attorneys for the Plaintiff*

                       Benjamin Adam Lasky
                       KIRKLAND & ELLIS LLP
                       *Attorneys for the Defendants*

LEWIS A. KAPLAN, *District Judge.*

       Plaintiff charges defendants with infringing its patent claiming an improved process for the synthesis of a chemical compound used in the manufacture of certain pharmaceuticals by selling in the United States the antidepressant drug citalopram, which defendants allegedly made using the compound synthesized according to plaintiff's patented process. Defendants have filed a counterclaim for declaratory judgment against plaintiff.

Magistrate Judge Ronald L. Ellis held a *Markman*[1] hearing to determine the construction of a number of disputed terms in the patent and issued a Report and Recommendation ("R & R") construing the disputed terms. Defendants object.

*Background*

Plaintiff Infosint, S.A. ("Infosint") owns the patent at issue in this case, U.S. Patent 6,458,973 (the "'973 patent"). It claims an improved process for making the compound 5-carboxyphthalide, which is used as an intermediate product in the synthesis of citalopram. Citalopram is a well-known antidepressant marketed in the United States under the names Celexa and Lexapro.[2]

The compound 5-carboxyphthalide had been synthesized successfully prior to the inventors' application for the '973 patent. What the inventors claimed was a superior manufacturing process, especially useful in industrial settings.[3] Their innovations included reacting the constituent compounds at a lower temperature and in a manner that did not generate a noticeable emission of gases.[4] Additionally, the inventors claimed the use of a new reaction medium, fuming sulfuric acid, in place of liquid sulfur trioxide.[5]

---

[1]   See *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370, 388-90 (1996).

[2]   Pl. Ex. B at col. 1:21-28; Pl. Ex. E ¶ 9.

[3]   Pl. Ex. B at col. 1:30-50.

[4]   Pl. Ex. H at 90-91, 108, 123.

[5]   Pl. Ex. B at col. 1: 44-55; Pl. Ex. H at 90-91.

In general terms, the process involves adding terephthalic acid to fuming sulfuric acid containing at least 20 percent sulfur trioxide, $SO_3$. Fuming sulfuric acid, also known as oleum,[6] is a mixture of sulfuric acid and sulfur trioxide.[7]  Next, formaldehyde is added to the mixture, which is heated at 120-145º C. The resulting 5-carboxyphthalide then is isolated from the solution[8].

Defendants, H. Lundbeck A/S, a Danish corporation, Lundbeck, Inc., its U.S. subsidiary (collectively "Lundbeck"), Forest Laboratories, Inc., and Forest Phramaceuticals, Inc., both Delaware corporations, (collectively "Forest"), manufacture, market, and sell citalopram.[9] Lundbeck synthesizes 5-carboxyphthalide at seven manufacturing facilities located outside of the United States.[10]   It manufactures also the antidepressant drugs citalopram and escitalopram in Denmark.[11]  Plaintiff alleges Lundbeck uses the 5-carboxyphthalide synthesized according to the process described in the '973  patent as an intermediate product in its production of citalopram and escitalopram. Forest markets and sells in the United States citalopram and escitalopram produced

---

[6]

Pl. Ex. B at col. 2:19.

[7]

*See* Pl. Ex. H at 91; Def. Ex. EE at 36150.

[8]

Pl. Ex. B at col. 2:26-44; col. 2:49 - col. 4:17.

[9]

Ans. at 2-3.

[10]

*See generally* Scott Decl., Ex. E to Memorandum in Support of Defendants' Motion for Summary Judgment of Non-Infringement.

[11]

Ans. at 2.

by Lundbeck under the trademarks Celexa and Lexapro, respectively.[12]

Citalopram is a compound with a stereogenic carbon center, or a carbon atom with four substituents bonded to it.[13]  Molecules with stereogenic centers can exist in two different, mirror image forms known as enantiomers.[14]

Enantiomers appear identical in two dimensional depictions, but are revealed as mirror images when viewed in three dimensions.[15]  To avoid confusion, chemists use different notations to differentiate enantiomers in two dimensional drawings.[16]  A molecule with one stereogenic center, like citalopram, has only two enantiomers.[17]  These are known as the S-enantiomer and R-enantiomer.[18]  When these two enantiomers appear in a mixture in a one-to-one ratio, the mixture is known as a racemate or racemic mixture.[19]  The drug Celexa is composed of

---

[12]

*Id.* at 2-3; Pl. Ex. 16 to Plaintiff's Memorandum in Support of Its Motion for Summary Judgment Dismissing Defendants' Counterclaim for Interfering Patents.

[13]

Scott Decl., Pl. Ex. E ¶ 17.

[14]

*Id.*

[15]

*Id.*

[16]

*Id.* ¶ 19.

[17]

*Id.*

[18]

*Id.* ¶ 18.

A "(+)" or "(-)" is sometimes used to distinguish between enantiomers instead of the letters "R" or "S."  Racemates are labeled "R/S," "racemic" or "(±)." *Id.*

[19]

*Id.* ¶ 17.

racemic citalopram. Lexapro is generally considered more effective, and consists of substantially pure S-citalopram or escitalopram only.[20]

The parties dispute the construction of five terms or phrases contained in the '973 patent. The parties submitted extensive briefing, and a *Markman* hearing was held on May 1, 2008/ Defendants object to four of the recommended constructions set out in the R&R.

*Discussion*

A.    *Objection to the Legal Standard*

Defendants object first that Magistrate Judge Ellis applied an incorrect legal standard in analyzing the construction of the '973  patent claims.  Specifically, defendants object to the R & R's statement that "[g]enerally, claims should be given their broadest meaning unless clearly disavowed in the specification of the patent."[21]  They argue that in *Phillips v. AWH Corp.*,[22] the case cited for this proposition, the Federal Circuit stated that claims are given their "broadest reasonable construction" only during prosecution before the Patent and Trademark Office ("PTO").[23]

The *Phillips* court used the "broadest reasonable construction" language in the course of describing the PTO's examination process.  But defendants erroneously focus their attention on

---

[20]

       *See, e.g.*, Ex. 7 & Ex. 8 at 7 to Infosint's Memorandum in Support of Its Motion for Summary Judgment Dismissing Defendants' Counterclaim for Interfering Patents; Def. Ex. L at 196:18-197:15; *see also Forest Laboratories, Inc. v. Ivax Pharmaceuticals, Inc.*, 438 F. Supp.2d 479 (D. Del. 2006).

[21]

       R & R at 2.

[22]

       415 F.3d 1303 (Fed. Cir. 2005) (en banc).

[23]

       Def. Obj. at 8-9 (quoting *Phillips*, 415 F.3d at 1316).

only this single sentence in *Phillips*.

The Federal Circuit in *Phillips* provided extensive guidance on the basic principles of claim construction.[24]  It instructed that courts are to give the words of a claim "their ordinary and customary meaning," which it defined as the meaning that "the term would have to a person of ordinary skill in the art in question at the time of the invention."[25]  To determine the customary meaning of claim terms, courts are directed to look to the context of the entire patent, including the other claims, the specification, and the prosecution history.[26]  Finally, extrinsic evidence may be considered in light of the intrinsic evidence, but courts should give it "less significan[ce] than the intrinsic record."[27]

Magistrate Judge Ellis fully and accurately summarized these claim construction principles and applied them correctly to the analysis of each of the disputed terms.  Accordingly, even if, as defendants argue, the "broadest meaning absent disavowal" formulation applies only before the PTO,[28] the use of the phrase did not affect the result – a result with which this Court independently agrees.

---

[24]

*Phillips*, 415 F.3d at 1312.

[25]

*Id.* at 1313 (internal quotation marks omitted).

[26]

*Id.* at 1313-17.

[27]

*Id.* at 1317-19.

[28]

*See Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1254 (Fed. Cir. 2008) (declining to adopt "broadest possible construction" of ambiguous claim because such a construction "could retard innovation").

B.      *"Citalopram"*

    1.      *Claims 21 and 24*

Defendants object to the R & R's construction of claims 21 and 24.

The '973  patent states in relevant part:

    "What is claimed is:

    "1.      A process for the preparation of 5-carboxyphthalide of formula A [figure A] which comprises adding formaldehyde and terephtalic acid of formula I [figure I] to fuming sulfuric acid containing at least 20% of $SO_3$, heating the mixture at 120-145° C. and isolating the 5-carboxyphthalide thus obtained.

        *   *   *

    "21.      A process for the synthesis of citalopram, in which a process for the synthesis of 5-carboxyphthalide according to claim 1 is contained.

        *   *   *

    "23.      A process for the preparation of 5-carboxyphthalide of formula A [figure A] which comprises adding formaldehyde (or a formaldehyde precursor) and terephthalic acid of formula I [formula I] to fuming sulfuric acid containing at least 20% of $SO_3$, heating the mixture at 120-145° C. and isolating the 5-carboxyphthalide thus obtained, wherein the process is conducted in an open, non-pressurized reactor.

    "24.      A process for the synthesis of citalopram, comprising the process for the synthesis of 5-carboxyphthalide according to claim 23."[29]

The R & R concluded that the phrase "[a] process for the synthesis of citalopram" limited claims 21 and 24.[30] Defendants contend that the phrase is non-limiting preamble and does not define the '973  patent's claims.

---

[29]      Pl. Ex. B at col. 7-8.

[30]      R & R at 6.

"In general, a claim preamble is limiting if it recites essential structure or steps, *or* if it is necessary to give life, meaning, and vitality to the claim."[31]   On the other hand, "if the body of the claim 'describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention,' the preamble is generally not limiting unless there is 'clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art.'"[32]

The R & R correctly concluded that the phrase "[a] process for the synthesis of citalopram" is necessary to give "life, meaning and vitality" to the claims.  An examination of the text of Claim 21 demonstrates this.  In its entirety, it states: "What is claimed is: . . . 21. A process for the synthesis of citalopram, in which a process for the synthesis of 5-carboxyphthalide according to claim 1 is contained."  In other words, far from being preamble, the disputed phrase constitutes the body of Claim 21.  Without it, Claim 21 loses all meaning. The same analysis applies with equal force to Claim 24, which is substantially the same as Claim 21.  The phrase thus limits the claims.

Citing *Intirpool*, the defendants argue that in order to determine whether a claim preamble is limiting or not, the court must first ascertain precisely what the invention is, and then analyze whether the preamble defines "additional . . . steps underscored as important by the specification."[33]   Insofar as the Court has concluded that the disputed phrase contains the substance

---

31

       *Intirtool, Ltd. v. Texar Corp.*, 369 F.3d 1289, 1295 (Fed. Cir. 2004) (internal quotation marks omitted) (emphasis added).

32

       *Id.* (quoting *Catalina Mktg., Int'l v. Coolsavings.com*, 289 F.3d 801, 808-09 (Fed. Cir. 2002).

33

       Def. Obj. at 11 (citing *Intirtool*, 369 F.3d at 1295).

9

of the claim, the preamble analysis does not apply.  But even if it did, this is not what *Intirpool* says. In that case, the alleged infringer Texar Corporation argued that whether a preamble is limiting "is determined in part on the basis of 'the invention as described in the specification . . . .'"[34]  However, the *Intirpool* court declined to adopt Texar's proposed method of analysis and ruled against Texar, holding that the disputed preamble was not limiting.[35]

Moreover, the case Texar relied upon to support its argument is distinguishable.  In *Applied Materials, Inc. v. Advanced Semiconductor Materials American, Inc.*,[36] the Federal Circuit explained that when a court evaluates whether "a preamble stating the purpose and context of an invention" constitutes a limitation, it must look to the overall form of the claim and the invention as described in the specification and illuminated in the prosecution history.[37]  Here, however, the disputed phrase does not state the purpose and context of the invention, but rather forms the substance of the claims.  Thus, application of *Applied Materials'* guidance is unnecessary to the resolution of the instant claim construction issue.

2.    *The Claimed Processes for Synthesizing Citalopram*

Defendants argue that if this Court adopts the R & R's recommendation construing "[a] process for the synthesis of citalopram" as a claim limitation, it should adopt also the R & R's

---

34
   *Intirtool*, 369 F.3d at 1294 (emphasis added).

35
   *Id.* at 1294-95.

36
   98 F.3d 1563 (Fed. Cir. 1996).

37
   *Id.* at 1572-73.

"recommendation to limit the claimed processes for making citalopram to those disclosed in the incorporated '431 and '724 Applications."[38]  The R & R made no such recommendation, and the Court declines so to hold.

>    3.    *The Meaning of "Citalopram"*

The R & R construed the term "citalopram" in the '973  patent to include "the S-enantiomer, the R-enantiomer, the racemate, or any other mixture of enantiomers."[39] Defendants object to this proposed construction for several reasons.

First, defendants object that the R & R did not cite to portions of the intrinsic evidence.  The '973  patent refers only to "citalopram" without defining the term, but incorporates by reference two patent applications that did define the term.[40]  The first is the International Patent Application 0023431 ("'431 application"), entitled "Method for the Preparation of Citalopram," which was published on April 27, 2000.[41]  The second is the Italian Patent Application MI 99A 001724 ("'724 application"), which claimed a process for the preparation of an isobenzofuran derivative, an intermediate compound used in the preparation of citalopram.[42]

The defendants argue that the R & R failed to consider particular portions of the '431

------

[38]

>    Def. Obj. at 15.

[39]

>    R & R at 1.

[40]

>    *See* Pl. Ex. B at col. 1:24-28 (incorporating '431 and '724 applications by reference).

[41]

>    Pl. Ex. F.

[42]

>    Pl. Ex. G at 11:8-9.

and '724 applications. But the R & R considered the manner in which both of the patent applications used "citalopram" and concluded that the applications used the term to refer to citalopram's S-enantiomer, R-enantiomer, racemate, or enantiomers in any other combination.[43]

This conclusion is supported by both the intrinsic and extrinsic evidence.  Those skilled in the art specify particular enantiomers and the racemate by adding labels to the chemical name of the compound.[44] Both the '431 and '724 applications refer to "citalopram" as "1-[3-(dimethylamino)propyl]-1-(4-fluorophenyl)-1,3-dihydro-5-isobenzofurancarbonitrile."[45] This, the full chemical name for citalopram, does not specify a particular enantiomeric form or the racemate.[46]

Both applications provide also a two dimensional figure depicting citalopram.[47] Those skilled in the art use certain conventions for indicating enantionmers in two dimensional depictions.[48] For example, a solid wedge instead of a simple line indicates atoms that extend above the plane of the paper, and a hashed wedge or line indicates atoms extending downward.[49] Neither

---

[43]

R & R at 6.

[44]

Pl. Ex. E ¶¶ 18, 20, 27.

[45]

Pl. Ex. F at 1; Pl. Ex. G at 2.

[46]

Pl. Ex. E ¶ 27; *see also* Pl. Ex. K at 5256 (labeling compound "racemic"); Def. Ex. H ¶ 34 (denoting enantiomers with addition of "(S)" and "(R)" before full chemical name for citalopram).

[47]

Pl. Ex. F at 2; Pl. Ex. G at 2; *see also* Pl. Ex. E  ¶ 24.

[48]

Pl. Ex. E ¶ 19; Williams Dep., Def. Ex. Q at 203:14-19.

[49]

Pl. Ex. E ¶ 19.

application's depiction of citalopram indicates a specific enantiomeric form.[50]  This indicates "citalopram" is used in the applications to refer to citalopram in either or both of its enantiomeric forms.

This understanding is confirmed by plaintiff's and defendants' experts.  Dr. Scott stated that, "[a]bsent definition of the three-dimensional stereochemistry via a stereochemical indicator, the chemical name or structure includes the S-enantiomer, the R-enantiomer, the racemate, or any other mixture of enantiomers."[51]  Defendants' expert, Dr. Williams, testified similarly.  He stated that "if the lines as drawn [in the figure of the citalopram compound] are all the same width . . . that would not tell me that that structure corresponds to S-citalopram, it would be ambiguous, and then I would assume that that structure would be corresponding to . . . either R or S or racemic citalopram."[52]

This understanding is reinforced also by the description of the invention in the '724 application.  There, it is described as one that "allows the preparation of two enantiomers of citalopram."[53]  Claim 1, however, states that it is "[a] process for the preparation of citalopram and of its pharmaceutically acceptable salts."[54]  Reading Claim 1 in light of this earlier description indicates that the term "citalopram" must include either or both of citalopram's enantiomers.

---

[50]

Pl. Ex. E ¶ 26.

[51]

Pl. Ex. E ¶ 20.

[52]

Pl. Ex. L at 207:11-19.

[53]

Pl. Ex. G at 11:9.

[54]

Pl. Ex. G at 20:1.

Likewise, the '431 application states that it "relates to a method for the preparation of . . . citalopram." Later in the specification, it states that the invention described "relates to a novel method for the preparation of citalopram, its enantiomers and acid addition salts thereof."[55]  This indicates that the '431 application used the term "citalopram" in its broader sense and added references to its enantiomers to clarify that the process permitted the synthesis of both the racemate and individual enantiomers.

Examining the applications as a whole thus demonstrates that the inventors used the term "citalopram" to refer to the compound 1-[3-(dimethylamino)propyl]-1-(4-fluorophenyl)-1,3-dihydro-5-isobenzofurancarbonitrile generally, in any of its forms: the S-enantiomer, the R-enantiomer, the racemate, or a mixture of the enantiomers in any other combination. At other times, the applications added the term "enantiomers" in order to clarify or emphasize what was being claimed.[56]  The additional clarification in places, however, cannot limit the use of the more general term "citalopram" when the applications read as a whole indicate the term was used in its broader sense.[57]

Defendants argue that the fact that the '973  patent refers to "citalopram" as a "well known antidepressant drug" indicates that "citalopram" must refer only to the racemate because the racemic form of citalopram was the only well-known antidepressant on the market at the time the

---

[55]   Pl. Ex. F at 3.

[56]   *See, e.g.*, Pl. Ex. F at 18.

[57]   *See, e.g.*, *Bell & Howell Document Mgmt. Prods. Co. v. Altek Systems*, 132 F.3d 701, 707 (Fed. Cir. 1997) ("Moreover, defining a state of affairs with multiple terms should help, rather than hinder, understanding.").

patent application was filed.[58]  But, as discussed above, the term "citalopram" was used in the '431 and '724 applications in a broader sense.  The term encompassed the racemate – then and now a "well known antidepressant drug" – as well as citalopram's other forms.

Defendants assert also that their interpretation of citalopram is supported by *Forest Laboratories, Inc. v. Ivax Pharmaceuticals, Inc.*[59]  As the R & R stated, the issue in *Forest Labs* was whether patent claims for substantially pure S-citalopram were invalid because they were anticipated or obvious in light of prior art that disclosed the presence of both of citalopram's enantiomers but provided the chemical structure of the R-enantiomer only.[60]  The court found that the patents were valid because the process for synthesizing substantially pure S-citalopram was unknown at the time the application was filed.  The court's conclusion, however, does not answer the question here, as the *Forest Labs* court did not interpret the use of the term "citalopram" standing on its own.

Finally, defendants argue that the court should examine the IP Rights Agreement to shed light on the patent drafters' contemporaneous interpretation of "citalopram."[61]  The contract states that Norpharma S.p.A., the applicant for the '724 patent, "is engaged in research and development on methods for manufacturing" racemic citalopram.[62]  However, even if the Court assumes that Norpharma was engaged exclusively in researching and developing racemic citalopram,

---

[58]  Def. Obj. at 16.

[59]  438 F. Supp.2d 479 (D. Del. 2006).

[60]  *Id.* at 486-87.

[61]  Def. Obj. at 19.

[62]  Pl. Ex. K at 5256.

15

an IP contract presumably drafted by attorneys does not reflect the intentions or understanding of the inventors.[63]  Thus, considering the balance of the evidence, most significantly the patent applications read as a whole, the Court overrules the objection and adopts the R & R's interpretation of the term "citalopram."


C.      *Formaldehyde*

The R & R found that formaldehyde, as used in the '973  patent, "includes 'all synthetically useful forms of formaldehyde including solid forms of formaldehyde such as paraformaldehyde and trioxane.'"[64]  Defendants object, arguing that "formaldehyde" should be interpreted to mean monomeric formaldehyde (HCHO) only.  Monomeric formaldehyde is a gas at room temperature.[65]  According to defendants, use of the R & R's construction requires different definitions of the same term throughout the claims and would render certain claims superfluous.

"'The descriptive part of the specification aids in ascertaining the scope and meaning of the claims inasmuch as the words of the claims must be based on the description.  The specification is, thus, the primary basis for construing claims'"[66] and "'[t]he best source for

---

[63]

    *See Middleton, Inc. v. Minnesota Mining and Mfg. Co.*, 311 F.3d 1384, 1389 (Fed. Cir. 2002) ("If a contract supplies some insight into the understanding of skilled artisans at the time of the invention, it may have some relevance to claim construction.").

[64]

    R & R at 10.

[65]

    Pl. Ex. E ¶ 34.

[66]

    *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (quoting *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985)).

understanding a technical term'"[67] used in the claims.  As Magistrate Judge Ellis correctly found, when the term is understood within the context of the patent as a whole, it is clear that "formaldehyde: was intended include forms other than monomeric formaldehyde.

The specification describes one step of the invented process as requiring the "subsequent addition of formaldehyde to the mixture."[68]  Later, in the "detailed description of the invention" section, the patent specifies that "[a]ccording to a preferred embodiment of the process of the present invention, formaldehyde is used in one of its solid forms, currently in form of its precursor 1,3,5-trioxane."[69]  This indicates that the patent writers intended to use the term "formaldehyde" to refer to the compound in more than just its monomeric form.

Further supporting this construction is the fact that the claims explicitly include formaldehyde precursors as a type of formaldehyde.  For example, Claim 1 requires "adding formaldehyde."[70]  Claims 2 and 3, which are dependent on Claim 1, describe "[a] process according to claim 1 in which formaldehyde is used in form of its precursor 1,3,5-trioxane" and "[a] process according to claim 1 in which formaldehyde is used in form of its precursor paraformadehyde." [71] Thus, Claims 2 and 3 describe more specific restrictions on the broader Claim 1 by specifying the

---

[67]

Id. (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998)) (alteration in original).

[68]

Pl. Ex. B. at col. 2:20-21.

[69]

Id. at col. 2:49-52.

[70]

Id. at col. 7:12.

[71]

Id. at col. 7:28-38.

particular form of formaldehyde used.

Defendants contend that this construction renders claims and parts of claims superfluous. Claim 23 states in relevant part, "[a] process for the preparation of 5-carboxyphthalide of formula A which comprises adding formaldehyde (or a formaldehyde precursor)." Here, the phrase "or a formaldehyde precursor" is merely an explanatory parenthetical intended to assist understanding and reinforces the definition of formaldehyde used in the patent as a whole. This use of additional words "to help not hinder understanding" is not superfluous.[72]

Defendants contend also that the R & R's construction would render Claim 22 superfluous in its entirety because the only substantive difference between that claim and Claim 23 is the phrase "or a formaldehyde precursor."[73] However, as Magistrate Judge Ellis noted, the doctrine of claim differentiation "'is a guide, not a rigid rule.'"[74] Indeed, "'[i]t is not unusual that separate claims may define [an] invention using different terminology, especially where . . . independent claims are involved.'"[75] Here, Claim 22 depends from independent Claim 1. Claim 23 is independent. Where the claims are independent and the drafters' intentions are otherwise clearly evidenced by the specification as a whole, the doctrine of claim differentiation does not control.[76]

---

[72]

*Bell & Howell*, 132 F.3d at 707 (mutually reinforcing definitions not superfluous).

[73]

Def. Obj. at 20-21.

[74]

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006) (quoting *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991)).

[75]

*Id.* (quoting *Hormone Research Foundation, Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1567 n.15 (Fed. Cir. 1990)).

[76]

*See, e.g.*, *Hormone Research Found.*, 904 F.2d at 1567 n.15.

D.      *Fuming Sulfuric Acid*

Fuming sulfuric acid, or oleum, is a mixture of sulfuric acid ($H_2SO_4$) and sulfur trioxide .[77] The R & R recommends construing the phrase "fuming sulfuric acid containing at least 20% $SO_3$" to mean "20% $SO_3$ up to an amount to which sulfuric acid would be considered an impurity."[78] Defendants object to this construction for several reasons, none of which is persuasive.

First, defendants argue that the term "impurity" is ambiguous. They contend that the issue of dispute – the permitted upper limit of $SO_3$ or minimum amount of sulfuric acid in "fuming sulfuric acid" – improperly will be left for the jury.  But defendants' would define "fuming sulfuric acid," a mixture of sulfur trioxide and sulfuric acid, to include otherwise pure sulfur trioxide $SO_3$ containing a single molecule of water.[79]  In other words, the real issue here is not a supposed ambiguity in the recommended definition, but that defendants would define fuming sulfuric acid to include $SO_3$ that contains only the slightest impurity.  The R & R notes correctly that defendants' evidence does not support such a definition.  For example, the deposition testimony cited by the defendants indicates that the properties of $SO_3$ would be affected by the presence of protons, *i.e.* the presence of sulfuric acid or water, but not that the presence of any protons would transform $SO_3$ to

---

[77]

   *See* Pl. Ex. H at 91; Pl .Ex. B at col. 2:19; Def. Ex. EE at 36150.

[78]

   R & R at 25.

[79]

   Def. Obj. at 27.

   The water molecule combines with the sulfur trioxide to form sulfuric acid. *See* Def. Ex. Q at 106:4-10.

fuming sulfuric acid.[80]  For example, defendants' expert, Dr. Williams, testified that "commercial grade Sulfan B, liquid sulfur trioxide, contain[s] enough sulfuric acid" that it could prove problematic in a "reaction that is sensitive to the presence of protons," but not that this presence transforms Sulfan B into fuming sulfuric acid.[81]

The defendants object also to what they characterize as the R & R's "undue reliance" on the decision of the European Opposition Division.  However, as the R & R demonstrates, Magistrate Judge Ellis did not place undue weight on the decision of a foreign patent office. The R & R notes merely that following its review of plaintiff's European counterpart to the '973  patent, the European patent office's construction of the phrase "fuming sulfuric acid" supported Magistrate Judge Ellis' own.  This is not improper.[82]

E.      *Open, Non-Pressurized Reactor*

Magistrate Judge Ellis recommends that the phrase in Claim 23, "'the process is conducted in an open, non-pressurized reactor," means "a reactor that allows gases to escape during the reaction,' where 'substantial pressures are not applied or allowed to build up during the reaction requiring a pressure or sealed reactor.'"[83]   Defendants object and argue the phrase should be

---

[80]

See Def. Ex. Q at 107-09; *see also* Def. Ex. HH ¶¶ 46-47 (Sulfan B is $SO_3$ not oleum or fuming sulfuric acid).

[81]

Def. Ex. Q at 107-09.

[82]

See, e.g., *Mineral Separation v. Hyde*, 242 U.S. 261, 269 (1916) (noting agreement with House of Lords on an equivalent patent application).

[83]

R & R at 15.

construed to mean that "'the process is conducted at atmospheric pressure in a reactor where there is a bidirectional exchange of gases between the reactor and the atmosphere.'"[84]

Nothing in the claim supports defendants' contention that the term "open" should be construed to mean "a bidirectional exchange of gases." Nor do defendants point to intrinsic or extrinsic evidence supporting that proposed construction. Dr. Scott's declaration, however, supports the R & R's construction that "open" means permitting gases to escape. He described an open system as "one in which the gases generated in a reaction are allowed to escape from the reaction vessel." The gases may be permitted to escape simply by venting them to the air, or may involve "their collection by use of condensers and/or scrubbers or catalytic burners" as may be appropriate in an industrial setting.[85]

Defendants contend also that "non-pressurized" means "conducted at atmospheric pressure." But the specification supports Magistrate Judge Ellis's construction. It states that the prior art process required "pressure reactors" when conducted on an industrial scale.[86] In contrast, the process described in the '973 patent may be conducted in "no[n-]pressurized reactors."[87] A non-pressurized reactor therefore does not necessarily mean that the process must be conducted at atmospheric pressure, although it includes reactions run at atmospheric pressure, but rather that a

---

[84]

Def. Obj. at 32.

[85]

Pl. Ex. E ¶ 42.

[86]

Pl. Ex. B at col. 2:12-14.

[87]

*Id.* at col. 2:17-25.

21

purposely pressurized reactor is not required.[88]  This objection is overruled.

<em>Conclusion</em>

For the foregoing reasons, defendants' objections to the R & R are overruled.

Accordingly, the Court adopts Magistrate Judge Ellis's recommendations.

SO ORDERED.

Dated:          March 27, 2009

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[88]          *See* Pl. Ex. E ¶ 46.